UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FELIX A. MELENDEZ, )<br>     Petitioner )<br>v. )<br>SHAWN ZOLDAK, )<br>     Respondent. ) | Case No. 23-cv-12132-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                   June 2, 2025

**I. Introduction**

Petitioner Felix A. Melendez ("Petitioner" or "Melendez") has filed a petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 ("the Petition"), alleging that trial counsel's failure to file a motion to suppress cell phone evidence violated Petitioner's Sixth and Fourteenth Amendment rights. D. 1. For the reasons set forth below, the Court DENIES the Petition.

**II. Standard of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that a person in state custody may petition a federal court for relief on the grounds that such custody is in violation of the petitioner's constitutional rights, or the laws and treaties of the United States. 28 U.S.C. § 2254(a). For a federal *habeas* court to grant relief, the burden lies with the petitioner to demonstrate that the judgment of the state court, as adjudicated on the merits, was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable

1

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Section 2254(d)(1) provides two discrete paths to relief. A state court's judgment is "contrary to" federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The "unreasonable application" clause applies when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Significantly, "an unreasonable application of federal law is different from an incorrect application of federal law," id. at 365 (emphasis in original), such that a state court's application of the law will not be deemed unreasonable if "'fairminded jurists could disagree' on the correctness of the state court's decision," Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Under § 2254(d)(2), factual determinations made by a state court are "presumed to be correct" unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in the light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). In essence, *habeas* relief provides a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Harrington, 562 U.S. at 102-03 (internal quotations omitted). Accordingly, AEDPA "mandates highly deferential federal court review of state court holdings." Zuluaga v. Spencer, 585 F.3d 27, 29 (1st Cir. 2009) (citing

2

Williams, 529 U.S. at 403). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" as § 2254(d) is "designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." Harrington, 562 U.S. at 102-03.

### III.     Relevant Factual and Procedural Background

Unless otherwise noted, the factual background set forth below is drawn from the Supreme Judicial Court (the "SJC") in its decision affirming Melendez's conviction. D. 7-1 at 273–89; Commonwealth v. Melendez, 490 Mass. 648 (2022).

#### A.     **Commission of the Crime**

The charges against Melendez arose out of events that occurred on July 3, 2013, at the victim's residence in Chelsea, Massachusetts. Melendez, 490 Mass. at 650. The victim, who was eighty-eight years old at the time of her death, lived on the second floor of her three-story home and rented the first-floor unit to two tenants and the third-floor unit to Melendez and his girlfriend. Id. At approximately 1:30 p.m. on July 3, 2013, the first-floor tenant told the victim that he was having trouble getting into his apartment. Id. The victim gave him a spare key, which he used to open his door, and then immediately returned. Id. Between approximately 3:30 and 4:30 p.m. that afternoon, the same tenant was in the living room of his apartment, directly below the room in which the victim's body was later discovered. Id. From overhead, he heard someone running and a scream, followed by a bang. Id. At trial, the tenant identified the scream as the victim's. Id. He testified that he did not hear anyone come down the stairs after he heard this noise and, if they had, he would have heard them from anywhere in his apartment. Id.

At approximately 12:45 a.m. on July 7, 2013, Chelsea firefighter Paul Doherty responded to a report of an electrical fire in the basement of the victim's residence. Id. When he arrived, no

smoke or flames were visible from the outside.  Id.  Doherty entered the basement, where he encountered Melendez.  Id. at 650-51.  There was no smoke in the basement, but it smelled like something had been burning and there was charring on one of the walls.  Id.  Melendez told Doherty that his girlfriend had smelled smoke and he had gone to the basement and extinguished what he suspected was an electrical fire.  Id. at 651.

Before Doherty left the scene, the fire department deputy chief asked him to check on the victim, who had not been seen in a few days.  Id.  Melendez led Doherty and another firefighter to the second-floor landing.  Id.  The door to the victim's apartment was locked.  Id.  One panel of the door to the apartment appeared to have been replaced with a piece of wood.  Id.  Without first knocking or calling out, Melendez began to strike the door around the wood panel.  Id.  Doherty asked him to stop.  Id.  After Doherty and the other firefighter went to the rear porch in search of another way to enter, Melendez called out that he had been able to open the door by reaching through the damaged panel.  Id.

Melendez entered the victim's apartment before the firefighters.  Id.  The entrance opened into a kitchen, which had doorways leading to a bedroom, a hallway and, farthest from the entrance, a dining room.  Id.  Melendez went directly to the dining room, where the victim was face down on the floor, with blood visible on her head and in her hair.  Id.  The victim's apartment was generally clean and tidy, but the victim's bedroom appeared to have been ransacked.  Id.

Additional officers were summoned and soon after Chelsea police officer Augustus Casucci arrived at the residence.  Id.  As Casucci and the firefighters approached the victim's apartment, Melendez, who appeared excited and nervous, attempted to join them.  Id. at 651–52.  Casucci told him not to do so.  Id. at 651.  Melendez went up to the third-floor apartment then came back to the victim's apartment and asked to enter, stating that his car keys might be inside.

4

Id. at 652.  Melendez was denied entry.  Id.  Later, two officers who were on the rear porch of the victim's apartment heard footsteps from the third-floor porch and noted that Melendez had come outside to smoke a cigarette.  Id.

The victim's son examined the apartment and provided investigators with a list of missing items.  Id.  All the victim's jewelry was gone, including a platinum or white gold ring with a row of diamonds, a gold wedding ring and a white gold pinky ring with two stones.  Id.  The victim's credit card, checkbook, cellphone, strong box and the keys to the other apartments in the house were also missing.  Id.

Detectives checked various pawn shops in the area.  Id.  On July 8, 2013, detectives learned that three days prior Melendez had sold some items at a nearby jewelry store for $130.  Id.  The sale records contained a copy of Melendez's driver's license.  Id.  The items sold included a gold wedding band and a platinum or white gold ring with a row of diamonds.  Id.  The victim's son identified the diamond ring as the victim's.  Id.

Detectives obtained cell phone records from Melendez's cellular service provider pursuant to a warrant.  Id. at 653.  These showed that between 6:58 and 7:42 p.m. on July 3, 2013, Melendez made seven calls to four different pawn shops or jewelry buyers in the Boston area but had made no such calls in the preceding week.  Id.  Melendez also called two pawn shops on the morning of July 6, 2013.  Id.

On July 7, 2013, the day the victim's body was discovered, police officers interviewed the building's tenants, including Melendez.  Id.  Melendez said that on July 3, 2013, he had driven his girlfriend to work and returned to their apartment at around 7:30 or 8 a.m.  Id.  His girlfriend's work records, however, showed that she did not arrive at work until 1:15 p.m.  Id. at 654.  Melendez also said that he was out of the building between approximately noon and 3 p.m. while

5

he went to a store and visited a friend. Id. at 653. Melendez said that upon returning he had seen the first-floor tenant speaking with the victim about his difficulty accessing his apartment. Id. Soon after, the victim told Melendez that the lights in her apartment were not working. Id. Melendez said that he confirmed the lights were not working, went to the basement to fix the circuit breakers, returned to the victim's apartment to confirm the lights had been fixed and then went upstairs to his third-floor apartment. Id. He said that around 4 p.m. he went to see someone named Ricky Crespo in Chelsea for automobile repairs. Id. Later investigation revealed, however, that Ricky Crespo's automobile body shop was in Dedham, Massachusetts, not Chelsea. Id. at 654. Instead, Melendez's friend, Orlando "Oly" Crespo ("Oly Crespo" or "Crespo") lived in Chelsea, at the address that the defendant had provided. Id. Melendez said he picked his girlfriend up from work at approximately 4:30 or 5 p.m. and returned to their apartment. Id. at 653. When asked to clarify his whereabouts between 3:00 and 6:00 p.m. on July 3, 2013, Melendez changed his story and said instead that he had been at home painting a vanity. Id.

Melendez stated that on July 4, 2013, he had spent time with Oly Crespo. Id. Melendez reported that they had driven all around that day, but he could not remember where they had gone. Id. at 653–54. Melendez said he had also spent most of July 6, 2013, with Crespo. Id. at 654.

On July 8, 2013, two investigators returned to the residence and asked Melendez for a buccal swab. Id. After providing the sample, Melendez told the investigators, "[j]ust to let you guys know, I've been in that apartment before." Id. He said that on July 3, 2013, he had been sitting on a chair in the kitchen of the victim's apartment when the first-floor tenant came upstairs to inform the victim that he was locked out of his apartment. Id. After the first-floor tenant took and returned the spare key, Melendez went up to his apartment for ten to fifteen minutes and then returned to the victim's apartment and watched television with her. Id. Melendez also shared that

6

on the day of her death, the victim did not look well and was unsteady on her feet. Id. Melendez said that he may have helped her around the apartment that day while she leaned on his arm. Id. He said he talked to the victim "all the time" and insisted "[a]sk anyone. They'll tell you." Id. Melendez also observed, "[i]f I was that guy — kind of guy, she was an easy target." Id. The person who had delivered the victim's Meals on Wheels lunch in the late morning of July 3, 2013, however, said that the victim seemed fine. Id. The victim's son, who had spoken to her on the telephone that afternoon, also testified that she had sounded fine. Id.

On July 9, 2013, police searched Melendez's apartment pursuant to a warrant and seized his cell phone. Id. On August 21, 2013, detectives obtained a warrant to search that phone. Id. Upon their search, detectives reviewed Melendez's contact list, internet search history, a Facebook messaging chat thread "Facebook chat" and text messages. Id. At trial, the Commonwealth introduced evidence that the Facebook chat contained a photograph of a "notice to quit" for nonpayment of rent, issued on June 25, 2013 to Melendez and his girlfriend. Id. In addition, Melendez's contacts included various drug rehabilitation centers, pawn shops and jewelry stores. Id. at 654-55.

The Facebook chat showed that on June 19, 2013, Melendez sent a message to his girlfriend that he would be "going on [his] journey," that he "need[ed] to get all of this poison out of [himself]" and that he "ha[d] been down this road before." Id. at 655 (alternations in original). On July 9, 2013, Melendez had texted his girlfriend: "[m]y mother said thank you for telling her I'm using dope . . ." and "[d]on't worry . . . Chino [Melendez] is gone with the wind. You have a good life and your keys will be somewhere. I don't want nothing to do with this place. I'm going to move on . . . ." Id. (alterations in original). The final outgoing text, which Melendez sent that same day, said "I'm leaving. Bye, Mom." Id.

7

In Melendez's first two trials, as to the robbery and murder charges, At Melendez's third criminal trial, which started on September 19, 2016, id. at 656, Oly Crespo testified that he first met Melendez at a drug detoxification facility, id. at 655. Crespo described his own history of heroin abuse and noted that he had been in a drug rehabilitation program just two weeks prior to testifying. Id. Crespo did not remember seeing Melendez in the summer of 2013, but testified that he "might have" gone to a pawn or jewelry shop with him "a long time" ago. Id.

Melendez did not call witnesses and did not testify. Id. Upon cross-examination of several witnesses called by the Commonwealth, defense counsel sought to establish that police officers had not adequately investigated the case. Id. Specifically, they suggested officers should have investigated whether the adult son of Melendez's girlfriend, who was also living in the third-floor apartment, was the perpetrator. Id. The son was wearing a global positioning system monitoring bracelet in July 2013, and admitted that he had been drinking the week of the murder. Id. at 655–56. On July 6, 2013, he had passed out in the third-floor apartment and was woken by his mother, who smelled smoke. Id. at 656. Defense counsel also emphasized that the police failed to investigate discrepancies in the statements of the first-floor tenant, to obtain corroborating information about the location of Melendez's girlfriend's son at relevant times and to obtain Melendez's girlfriend's son's cell phone and text message records. Id.

B.    **State Court Proceedings**

A grand jury indicted Melendez on the following counts: murder, unarmed robbery of a person aged sixty years or greater, and receiving stolen property of a value greater than $250. Id. Melendez's first jury trial began on September 10, 2015. Id. The jury found him guilty of receiving stolen property but was unable to reach a unanimous verdict on the murder and robbery charges. Id. A mistrial was declared as to those counts only. Id. Melendez's second jury trial

on the murder and robbery charges began on February 22, 2016, and ended with the hung jury as to both counts. Id.

Melendez's third trial began on September 19, 2016. Id. At the close of the Commonwealth's case, Melendez filed a motion for a required finding of not guilty, which was denied. Id. The jury found Melendez guilty of murder on a theory of extreme atrocity or cruelty but acquitted him of the robbery charge. Id. Melendez was sentenced to a term of life without the possibility of parole on the murder conviction and three years on the conviction of receiving stolen property, to be served concurrently. Id.

Melendez appealed his conviction and later moved for a new trial based upon ineffective assistance of counsel, the denial of which was consolidated with his direct appeal. Id. at 649. In his appeal, Melendez raised five issues: (1) trial counsel was ineffective for failing to file a motion to suppress information collected from Melendez's cellphone on the ground that the warrant to search the cell phone was not supported by probable cause; (2) the trial judge erred in admitting evidence that Melendez had a history of opiate addiction and used heroin on occasions not related to the alleged crimes; (3) the evidence did not suffice to establish his guilt beyond a reasonable doubt on the murder charge and, therefore, the judge erred in not denying his motion for a required finding of not guilty; (4) a fourth murder trial would violate State and Federal double jeopardy principles and (5) Melendez should not have been tried for a third time. Id. at 649. Melendez sought SJC dismissal of the indictment and an ordering prohibiting retrial of any criminal charge. Id. at 649–50. After conducting "a thorough review of the record," the SJC found no reason to reverse the conviction or grant a new trial. Id. at 650.

As to the ineffective assistance of counsel issue (that is relevant to the Petition here), the SJC determined that because the affidavit to obtain Melendez's cell phone records, "on its face,

9

contained insufficient information to establish probable cause to search the cell phone, trial counsel was ineffective for failing to file a motion to suppress the evidence recovered from the search of the cell phone." Id. at 661. That affidavit, which accompanied the application for a search warrant of the cell phone, "asserted that probable cause existed to believe that evidence of the victim's murder and the robbery of her apartment would be found on the cell phone." Id. at 659. Although "the information in the affidavit undoubtedly demonstrated probable cause to believe that [Melendez] committed the offenses described, [] this alone [did] not suffice to justify a search of the cell phone." Id. Specifically, "the affidavit lacked any information" that could demonstrate a "nexus between the alleged crime and the device to be searched." Id. "At most, a commonsense reading of the affidavit . . . disclose[d] that [Melendez] owned a cell phone and that the cell phone was recovered from the apartment where [Melendez] resided and where one fruit of [Melendez's] alleged crimes, the engagement ring, was discovered." Id. The fact that "both items were found in [Melendez's] residence, standing alone, [did] not reasonably establish a nexus between the cell phone and the alleged crimes." Id. Accordingly, "the portions of the defendant's list of contacts, his internet browsing history, the messenger chat containing the image of the notice to quit, and his text messages with his girlfriend and his mother should have been suppressed." Id. at 661.

Despite defense counsel's error in failing to file a motion to suppress, the SJC concluded "the remaining evidence, viewed in the light most favorable to the Commonwealth," nevertheless "sufficed to support [Melendez's] conviction" such that "no substantial likelihood of a miscarriage of justice occurred." Id.

### C. This Petition

Melendez filed this Petition pursuant to 28 U.S.C. § 2254(a) on the grounds that he is being held in state custody "in violation of the Constitution . . . of the United States." D. 1 at 5.

### IV.    Discussion

Melendez argues that under § 2254(d) a writ of *habeas corpus* should issue because, when the SJC decided that Melendez's right to effective assistance of counsel was not violated, it undertook a prejudice analysis that was both "contrary to" and an "unreasonable" application of federal law. D. 2 at 16–22; 28 U.S.C. § 2254(d).

Specifically, Melendez asserts that the SJC evaluated the prejudice arising from defense counsel's failure to suppress the cell phone evidence using a sufficiency of the evidence test "contrary to" the prejudice analysis in Strickland v. Washington, 466 U.S. 688 (1984). D. 2 at 19–21; D. 15 at 5–9. According to Melendez, a "proper Strickland analysis" would reveal that he was "prejudiced by his attorney's ineffective assistance," because defense counsel's failure to suppress evidence relied upon by the Commonwealth to establish motive and consciousness of guilt is "unquestionably 'sufficient to undermine confidence in the outcome.'" D. 2 at 3–4 (quoting Strickland, 466 U.S. at 694). Even if not "contrary to" Strickland, Melendez argues that the SJC's prejudice analysis was "plainly 'unreasonable'" given its decision to review the trial record "in the light most favorable to the Commonwealth." D. 2 at 21–22. Both arguments fail: the SJC rendered a decision that was neither "contrary to," nor an "objectively unreasonable" application of clearly established federal law.

#### A.    The SJC decided Melendez's claim of ineffective assistance of counsel on the merits

Melendez does not contest that the SJC's decision that there was no "substantial likelihood of a miscarriage of justice" qualifies as an adjudication on the merits. D. 2 at 19. AEDPA "provides that on federal habeas review, the level of deference owed to a state court decision hinges on whether the state court ever adjudicated the relevant claim on the merits." Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010) (citing 28 U.S.C. § 2254(d)). While *habeas* review is typically

11

deferential, absent an adjudication on the merits, *de novo* review is appropriate. Id. at 52. When "a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington, 562 U.S. at 99. Therefore, deferential review under 28 U.S.C. § 2254 is appropriate.

### B.    The SJC's decision was not "contrary to" clearly established Federal law

For the purposes of *habeas* review, "[t]he Strickland standard qualifies as clearly established federal law." Janosky v. St. Amand, 594 F.3d 39, 47 (1st Cir. 2010). Petitioners establish ineffective assistance of counsel under Strickland if they show (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687. Deficient performance is performance that falls "below an objective standard of reasonableness under the circumstances." Yeboah-Sefah v. Ficco, 556 F.3d 53, 70 (1st Cir. 2009) (quoting Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007)).

As "[t]he standards created by Strickland and § 2254(d) are both highly deferential . . . when the two apply in tandem, review is doubly so." Harrington, 562 U.S. at 105 (internal citations and quotation marks omitted); see Simpson v. Carpenter, 912 F.3d 542, 599 (10th Cir. 2018) (reviewing a state court's "prejudice determination under AEDPA's and Strickland's doubly deferential standard of review"); Arroyo v. Eckert, No. 18CV5819PGGJLC, 2020 WL 3884892, at *20 (S.D.N.Y. May 28, 2020) (noting that "given the doubly deferential standard for ineffective assistance of counsel claims, the [state court's] determination that [the defendant] was not prejudiced by trial counsel's [ineffective assistance] was not unreasonable"). A federal *habeas* court considers "whether the state court applied Strickland to the facts of petitioner's case in an objectively unreasonable manner." Yeboah-Sefah, 556 F.3d at 71 (citing Malone v. Clarke, 536

12

F.3d 54, 63 (1st Cir. 2008)).  To obtain relief from a federal court, a *habeas* petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington, 562 U.S. at 103.

Melendez argues the SJC reached its conclusion "contrary to" clearly established federal law because in rendering its decision, it improperly relied upon a "sufficiency of the [untainted] evidence" test "opposite in character or nature" to a Strickland prejudice analysis.  D. 2 at 19–21.  While Strickland requires a showing that, but for defense counsel's error, there was a "reasonable probability" of a different outcome at trial, Melendez suggests that the SJC rejected his claim "on the grounds that [Melendez] had not established by a preponderance of the evidence that the result of his proceeding would have been different."  D. 2 at 20 (quoting Williams, 529 U.S. at 405–06).

To the extent that the SJC framed its prejudice analysis under Mass. Gen. L. c. 278, § 33E, § 33E is more favorable to a defendant than the constitutional test "set forth in Strickland," Walker v. Medeiros, 911 F.3d 629, 636 (1st Cir. 2018); see D. 11 at 15–16, as it requires "a comprehensive review of the entire record, for a substantial likelihood of a miscarriage of justice," Commonwealth v. Upton, 484 Mass. 155, 160 (2020), and asks "[i]f there was an error" and if so "whether it was likely to have influenced the jury's conclusion," Commonwealth v. Ayala, 481 Mass. 46, 62 (2018).  If a "conviction survives this more lenient state standard, then, absent exceptional circumstances, it follows that the conviction would survive the federal standard, and [there is] no reason the state courts would be required to say explicitly that both standards are met."  McCambridge v. Hall, 303 F.3d 24, 35 (1st Cir. 2002); see Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006) (concluding that "where the SJC applies its more favorable 'substantial likelihood of a

13

miscarriage of justice' standard, its decision will not be deemed to be 'contrary to' the Strickland criterion").

Although Melendez suggests that it was improper for the SJC to consider the sufficiency of the evidence in its evaluation of his ineffective assistance claim, D. 2 at 19–21; D. 15 at 5–9; see Tice v. Johnson, 647 F.3d 87, 110 (4th Cir. 2011) (observing that "[t]he familiar sufficiency-of-the evidence analysis centering on whether a reasonable jury could have convicted an adequately represented defendant is considerably more deferential than the Strickland test for prejudice"), the record makes clear that the SJC applied the § 33E substantial likelihood of a miscarriage of justice standard, which as noted above, subsumes the Strickland standard, see Melendez, 490 Mass. at 657, 661, 662 n.4, 665–68.

Moreover, AEDPA's "'highly deferential standard for evaluating state court rulings' requires that we read the SJC's opinion in such a way as to give its choice of language 'the benefit of the doubt.'" Ayala v. Alves, 85 F.4th 36, 58 (1st Cir. 2023) (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002)); see Bell v. Cone, 543 U.S. 447, 455 (2005) (reviewing the full context of a state Supreme Court decision to determine that the state court implicitly addressed an issue despite not explicitly saying it was doing so). Here, the SJC's reference to the appropriate question — whether any error committed by counsel "was likely to have influenced the jury's conclusion" and created a "substantial likelihood of a miscarriage of justice"— coupled with its statement that it was declining to exercise its discretion under § 33E after a "thorough review," suggests it understood and applied the relevant standard. Melendez, 490 Mass. at 657, 661, 668.

Under § 33E, generally, when "evidence of guilt is strong and one-sided . . . no substantial risk exists of a miscarriage of justice." Commonwealth v. Miranda, 22 Mass. App. Ct. 10, 21 (1986); see Commonwealth v. Hobbs, 482 Mass. 538, 556 (2019) (concluding tainted testimony

14

likely did not influence the jury's conclusion because the remaining evidence against the defendant was "substantial"). In addition, an error in admitting "tainted evidence [is] unlikely to have influenced the jury's decision for purposes of [the] § 33E analysis" if the evidence was "merely cumulative of other substantial evidence." Commonwealth v. Wilson, 486 Mass. 328, 339 (2020).

Here, the SJC concluded that "abundant" non-tainted evidence established Melendez's guilt. Melendez, 490 Mass. at 662 n.4. For example, the SJC observed that "the jury could have found from the evidence that [Melendez] repeatedly attempted to gain access to the victim's apartment while police officers were securing the scene, including under the apparent pretense of looking for his car keys, because of his guilty state of mind." Id. at 666. Likewise, Melendez "made a number of statements about his whereabouts on July 3, including about bringing his girlfriend to work and seeing Ricky Crespo, that the jury could have found to be false based on information obtained in the subsequent investigation." Id. at 667. "The jury also could have found that his statements about helping the victim with her lights, watching television with her, and helping her by the arm because she looked ill on July 3 all were part of an attempt to explain why his deoxyribonucleic acid and fingerprints might be found in the victim's apartment." Id.

Although not an element of the crime of murder, the SJC found that "the call records obtained from [Melendez's] cell service provider and Cre[s]po's testimony provided independent evidence of [Melendez's] drug addiction as a motive for the killing." Id. at 667 n.9. "The Commonwealth elicited testimony from Oly Crespo, that [Melendez] used heroin immediately after selling the victim's jewelry on July 5 and introduced evidence from [Melendez's] cell phone records that, within a week, he called two drug rehabilitation centers."[1] Id. at 662–63. The SJC

---

[1] Melendez's cell phone records in this instance "were obtained pursuant to a warrant that [Melendez] does not challenge, and [he] did not object to the admission of these records in evidence." Id. at 663 n.6.

determined that "[t]his evidence supported the Commonwealth's theory of motive that [Melendez] attacked and robbed the victim [to] sell the items stolen to fund his drug use." Id. at 663. "The evidence of [Melendez's] addiction therefore was relevant to show motive," and was obtained independently of the challenged affidavit. Id. In sum, the SJC appears to have engaged in the exact analysis required: it concluded the tainted evidence was "merely cumulative of other substantial evidence" properly introduced. Wilson, 486 Mass. at 339. This is not "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103. The SJC's analysis is also bolstered by the fact that Strickland requires "[t]he likelihood of a different result" to "be substantial, not just conceivable." Harrington, 562 U.S. at 112. "The difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" Id. (quoting Strickland, 466 U.S. at 697).

Nor is the SJC's approach here an outlier — when sufficiency claims are made in concert with claims concerning the prejudice resulting from tainted evidence, courts sometimes combine their analysis of both claims. See D. 11 n.7; see e.g., United States v. Allen, 390 F.3d 944, 951 (7th Cir. 2004) (concluding that "the evidence against [defendant] was sufficient to support a conviction and, thus, he was not prejudiced by his counsel's omission"); Barry v. Ficco, 392 F. Supp. 2d 83, 100 (D. Mass. 2005) (noting that "[t]aken as a whole, there was sufficient evidence to sustain [defendant's] convictions. Thus, the petitioner cannot establish that the failure to suppress the [contested evidence] caused him prejudice sufficient . . . to render his counsel's performance constitutionally defective"). "That this Court and other circuits have used language and analysis in line with that used by the SJC adds further force to the conclusion that the SJC's

16

formulation is not one with which 'fairminded jurists' could not agree." Linton v. Saba, 812 F.3d 112, 126 (1st Cir. 2016).

### C. The SJC's decision was not an "unreasonable application" of clearly established Federal law

Melendez argues that even if not "contrary to" Strickland, the SJC's prejudice analysis is an "unreasonable" application of clearly established federal law. D. 2 at 21–22; U.S.C. § 2254(d)(1). As an initial matter, Melendez argues this Court "is not circumscribed by a state court conclusion with respect to prejudice" because the SJC failed to apply the Strickland standard by entirely omitting a prejudice analysis." D. 2 at 21 (quoting Wiggins v. Smith, 539 U.S. 510, 534 (2003)). But, as discussed above, the SJC did not omit prejudice analysis and instead analyzed the entire record to determine the material influence of defense counsel's error on the jury's conclusion. Accordingly, AEDPA deference is appropriate. Clements, 592 F.3d at 52.

Second, Melendez argues the SJC's consideration of the evidence that supported the jury's verdict "in the light most favorable to the Commonwealth" constituted an unreasonable application of Strickland, which requires this Court to conduct its own analysis of whether defense counsel's deficient performance prejudiced Melendez. D. 2 at 21. But the SJC did conduct a "thorough review," see Melendez, 490 Mass. at 668, and indeed, it is well established that "Strickland places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." Wong v. Belmontes, 558 U.S. 15, 27 (2009).

In his attempt to construe the SJC's analysis of the evidence "in the light most favorable to the Commonwealth" as "unreasonable," Melendez relies upon the Fourth Circuit's determination that, upon review, it was "not bound . . . to view the facts in the light most favorable to the prosecution." Tice, 647 F.3d at 110; see D. 15 at 7. But in Tice, the Supreme Court of Virginia "scoured the trial record for any proof beyond [defendant's tainted] confession that might support

17

the jury's verdict" and identified only testimony from a single witness with limited credibility and "inconclusive physical evidence." Tice, 647 F.3d at 108. In that context, the Fourth Circuit observed that although a reasonable juror could "plausibly buy into the Commonwealth's theory," the court was not bound to that interpretation. Id. at 110. Here, although the SJC viewed the evidence in the light most favorable to the Commonwealth, it comprehensively reviewed the record and found evidence supporting guilt "abundant." Melendez, 490 Mass. at 662 n.4. Such a review of the evidence is not "unreasonable" under 28 U.S.C. § 2254(d).

## V.   Conclusion and Certificate of Appealability

For the foregoing reasons, the Court DENIES the Petition, D. 1. A petitioner may receive a certificate of appealability only if he "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A certificate of appealability is appropriate when "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Miller-El, 537 U.S. at 338 (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). Based upon the analysis of the record and the applicable law in this Memorandum and Order, the Court does not, at this juncture, conclude that reasonable jurists would find its conclusion denying the Petition debatable or wrong. The Court, therefore, is not inclined to issue a certificate of appealability but will give Melendez until June 23, 2025 to file a memorandum if he seeks to address the issue of whether a certificate of appealability is warranted as to the Petition.

**So Ordered.**

/s Denise J. Casper
United States District Judge